UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

GEORGE E. HOSTETLER,

                 Plaintiff,

-vs-                                 Case No.  6:04-cv-1252-Orl-JGG

JO ANNE B. BARNHART,
Commissioner of Social Security,

                 Defendant.

_____

## MEMORANDUM OF DECISION

      Plaintiff George E. Hostetler ["Hostetler"] appeals to the district court from a final decision of the Commissioner of Social Security [the "Commissioner"] denying his application for a period of disability, disability insurance benefits and supplemental security income benefits.  *See* Docket No. 1 (complaint).  For the reasons set forth below, the Commissioner's decision is **REMANDED**.

## I.    PROCEDURAL HISTORY

      On August 7, 2002, Hostetler filed claims for disability insurance benefits and supplemental security income, claiming disability as of June 20, 2002.  R. 52-54, 269-71.  On January 8, 2004, the Honorable Philemina M. Jones, Administrative Law Judge ["ALJ"], held a hearing on Hostetler's claim in Orlando, Florida.  Hostetler testified, and his attorney, Robert Hicks, Jr., appeared with him. R. 284A-323.

      On January 27, 2004, the ALJ ruled that Hostetler was not entitled to benefits.  R. 11-22. Following a review of the medical and other record evidence, the ALJ found that Hostetler had severe impairments, but did not have an impairment or combination of impairments that met or equaled a

listed impairment.  R. 21, Findings 3-4.  The ALJ also found that Hostetler's testimony regarding his limitations was not totally credible.  R. 21, Finding 5.  Further, the ALJ determined that Hostetler retained the Residual Functional Capacity ["RFC"] to perform a "significant" range of light work.[1] R. 19, 21, Findings 11 - 12.  Accordingly, the ALJ considered both vocational testimony and Medical-Vocational Rules ["Grids"] 202.14 and 202.15 as a framework for decision-making, and determined that Hostetler could perform other work.  The ALJ concluded that Hostetler was not disabled.  R. 21, Findings 12-13.

Hostetler timely appealed the ALJ's decision to the Appeals Council.  R. 10.  Finding no error or abuse of discretion, the Appeals Council denied review on July 21, 2004.  R. 7-9.  On August 18, 2004, Hostetler timely appealed the Appeals Council's decision to the United States District Court for the Middle District of Florida.  Docket No. 1.  On March 11, 2005, Hostetler filed a memorandum of law in support of his appeal of the denial of review.  Docket No. 19.  On May 2, 2005, the Commissioner filed a memorandum in support of her decision that Hostetler was not disabled.  Docket No. 20.  The appeal is ripe for determination.

## II.    THE PARTIES' POSITIONS

Hostetler assigns four errors to the Commissioner's decision: 1.) failing to accord substantial weight to the opinions of Hostetler's physicians; 2.) posing to the vocational expert hypothetical questions that were not supported by substantial evidence; 3.) improperly evaluating Hostetler's subjective complaints of pain; and 4.) failing to fully develop the record regarding Hostetler's mental

---

[1]Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  If someone can do light work, the Commissioner determines that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.  20 C.F.R. § 404.1567(b).

impairments.  Pl.'s Brief at 7-17.  The Commissioner responds that her decision was supported by substantial evidence and was decided by proper legal standards.  The Commissioner asserts that:1.) the ALJ properly accorded weight among Hostetler's physicians; 2.) substantial evidence supported the hypothetical questions; 3.) substantial evidence did not support Hostetler's allegations of disabling pain; and 4.) the ALJ properly developed the record.  Def.'s Brief at 4-10.

III.    **THE STANDARD OF REVIEW**

   A.    **Affirmance**

The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405 (g).  Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord*, *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.  *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  *Foote*, 67 F.3d at 1560; *accord*, *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of

factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

### B. <u>Reversal and Remand</u>

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause. 42 U.S.C. § 405 (g)(Sentence Four). The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1066 (11th Cir. 1994); *accord, Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). This Court may reverse the decision of the Commissioner, and order an award of disability benefits, where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord*, *Bowen v. Heckler*, 748 F.2d 629, 631, 636 - 37 (11th Cir. 1984).

The district court may remand a case to the Commissioner for a rehearing under sentence four of 42 U.S.C. § 405 (g); under sentence six of 42 U.S.C. § 405 (g); or under both sentences. *Jackson v. Chater*, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996). To remand under sentence four, the district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. *Jackson*, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); *accord Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir.

1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision. *Falcon v. Heckler*, 732 F.2d 872, 829 - 30  (11th Cir. 1984) (remand was appropriate to allow ALJ to explain his basis for determining that claimant's depression did not significantly affect her ability to work) (treating psychologist acknowledged that claimant had improved in response to treatment and could work in a supportive, non-competitive, tailor-made work environment).  On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence.  *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (ALJ should consider on remand the need for orthopedic evaluation).  After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction.  *Jackson*, 99 F.3d at 1089, 1095.

In contrast, sentence six of 42 U.S.C. § 405 (g) provides:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405 (g).

To remand under sentence six, the claimant must establish:  1.) that there is new, non-cumulative evidence; 2.) that the evidence is material — relevant and probative so that there is a reasonable possibility that it would change the administrative result; and 3.) there is good cause for

failure to submit the evidence at the administrative level. *See Jackson*, 99 F.3d at 1090 - 92; *Cannon v. Bowen*, 858 F.2d 1541, 1546 (11th Cir. 1988); *Smith v. Bowen*, 792 F.2d 1547, 1550 (11th Cir. 1986); *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986); *see also Keeton v. Dept. of Health and Human Serv.*, 21 F.3d 1064, 1068 (11th Cir. 1994).

A sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant. *Jackson*, 99 F.3d at 1095. With a sentence-six remand, the parties must return to the district court after remand to filemodified findings of fact. *Jackson*, 99 F.3d at 1095. The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings. *Id*.

## IV.   **THE LAW**

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416 (i), 423 (d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do his or her previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423 (d)(2); 20 C.F.R. §§ 404.1505 - 404.1511.

### A.   **Treating Physicians**

Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise. *See Lewis v.* Callahan, 125 F.3d 1436, 1439 - 1441 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991); *Sabo v. Commissioner of Social Security*, 955 F.Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527

(d).  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527 (d)(2).  The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  *See Edwards*, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also Schnor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).  When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the 1.) length of the treatment relationship and the frequency of examination; 2.) the nature and extent of the treatment relationship; 3.) the medical evidence supporting the opinion; 4.) consistency with the record a whole; 5.) specialization in the medical issues at issue; 6.) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527 (d).  However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  *See Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir.1984); *see also* 20 C.F.R. § 404.1527 (d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  20

C.F.R. § 404.1527 (e).   The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because that ultimate determination is the providence of the Commissioner.  20 C.F.R. § 404.1527 (e).

### B.      Developing the Record

The ALJ has a duty to fully and fairly develop the record.  *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988); *Cowart v. Schweiker*, 662 F.2d 731, 735 - 36 (11th Cir. 1981).  The Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the social security hearing, and to solicit a knowing and voluntary waiver of that right.  *See* 42 U.S.C.§ 406; *Cowart*, 662 F.2d at 734.  The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel.  *See Cowart*, 662 F.2d at 735 - 36.  However, where an unrepresented claimant has not waived the right to retained counsel, the ALJ's obligation to develop a full and fair record rises to a special duty.  *See Hostetler v. Shalala*, 44 F.3d 931, 934 - 35 (11th Cir. 1995), *citing Smith v. Schweiker*, 677 F.2d 826, 829 (11th Cir. 1982).  This special duty requires the ALJ to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts" and to be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited."  *Cowart*, 662 F.2d at 735 (citations omitted).

### C.      Medical Tests and Examinations

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether

the claimant is disabled.  20 C.F.R. § 416.917; *see also Conley v. Bowmen*, 781 F.2d 143, 146 (8th Cir. 1986).  In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision.  *Holladay v. Bowen*, 848 F.2d 1206, 1209 (11th Cir. 1988); *Reeves v. Heckler*, 734 F.2d 519, 522 n. 1 (11th Cir. 1984) (failure to order such an evaluation may be reversible error).  Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary.  20 C.F.R. § 416.917 (1998).

### D.     The Five Step Evaluation

The ALJ must follow five steps in evaluating a claim of disability.  *See* 20 C.F.R. §§ 404.1520, 416.920.  First, if a claimant is working at a substantial gainful activity, she is not disabled.  20 C.F.R. § 404.1520 (b).  Second, if a claimant does not have any impairment or combination of impairments which significantly limit his or her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.  20 C.F.R. § 404.1520 ©).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.  20 C.F.R. § 404.1520 (d).  Fourth, if a claimant's impairments do not prevent him or her from doing past relevant work, she is not disabled.  20 C.F.R. § 404.1520 (e).  Fifth, if a claimant's impairments (considering his or her residual functional capacity, age, education, and past work) prevent him or her from doing other work that exists in the national economy, then claimant is disabled.  20 C.F.R. § 404.1520 (f).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments, and must consider

any medically severe combination of impairments throughout the disability determination process. 42 U.S.C. § 423 (d)(2)(B). The ALJ must evaluate a disability claimant as a whole person, and not in the abstract as having several hypothetical and isolated illnesses. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993). Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled. *See id.*, 985 F.2d at 534.

The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991). The claimant must prove disability on or before the last day of his or her insured status for the purposes of disability benefits. *Ware v. Schweiker*, 651 F.2d 408, 411 (5th Cir. 1981); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979); 42 U.S.C. §§ 416 (i)(3); 423(a), (c). If a claimant becomes disabled after the claimant has lost insured status, his or her claim for disability benefits must be denied despite the disability. *See, e. g., Kirkland v. Weinberger*, 480 F.2d 46 (5th Cir. 1973); *Chance v. Califano*, 574 F.2d 274 (5th Cir. 1978).

### E.    The Evaluation of Mental Disorders

The evaluation of disability on the basis of mental disorders requires the documentation of a medically determinable impairment, as well as consideration of the degree of limitation such impairment may impose on the individual's ability to work. The listings for mental disorders are arranged in eight diagnostic categories. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The criteria in paragraphs B and C of the listings for mental disorders describe those functional limitations associated with mental disorders which are incompatible with the ability to work — i.e. limitations in functional

-10-

areas deemed essential to work.  A mental impairment is medically equivalent to a listed mental impairment if the medical findings are at least equal in severity and duration to the listed findings. 20 C.F.R. § 404.1526.  An individual meeting or equaling the criteria could not reasonably be expected to engage in gainful work activity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Individuals who have an impairment with a level of severity which does not meet the criteria of the listings for mental disorders may or may not have the residual functional capacity ["RFC"] which would enable them to engage in substantial gainful work activity.  The determination of mental RFC is crucial to the evaluation of an individual's capacity to engage in substantial gainful work activity when the criteria of the listings for mental disorders are not met or equaled, but the impairment is nevertheless severe.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

For mental disorders, severity is assessed in terms of the functional limitations imposed by the impairment.  Functional limitations are assessed using the criteria in paragraph B of the listings for mental disorders (activities of daily living; social functioning;  concentration, persistence, or pace; and ability to tolerate increased mental demands associated with competitive work).  A "marked" degree of limitation means more than moderate, but less than extreme.  A marked limitation may arise when several activities or functions are impaired or even when only one is impaired, so long as the degree of limitation is such as to seriously interfere with the ability to function independently, appropriately and effectively.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The Commissioner employs a technique to ensure that ALJ's obtain, consider, and properly evaluate all evidence needed to evaluate mental impairment severity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The technique is used in connection with the sequential evaluation process.  *See* 20 C.F.R. §§ 404.1520a and 416.920a.

The presence of a mental disorder should be documented primarily on the basis of reports from individual providers, such as psychiatrists and psychologists, and facilities such as hospitals and clinics. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Information from both medical and non-medical sources may be used to obtain detailed descriptions of the individual's activities of daily living; social functioning; concentration, persistence and pace; or ability to tolerate increased mental demands (stress). This information can be provided by programs such as community mental health centers, day care centers, and family members who have knowledge of the individual's functioning. 20 C.F.R. Pt. 404, Subpt. P, App. 1. In some cases descriptions of activities of daily living or social functioning given by individuals or treating sources may be insufficiently detailed and/or may be in conflict with the clinical picture otherwise observed or described in the examinations or reports. It is necessary to resolve any inconsistencies or gaps that may exist in order to obtain a proper understanding of the individual's functional restrictions.

An individual's level of functioning may vary considerably over time. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The level of functioning at a specific time may seem relatively adequate or, conversely, rather poor. Proper evaluation of the impairment must take any variations in level of functioning into account in arriving at a determination of impairment severity over time. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Thus, it is vital to obtain evidence from relevant sources over a sufficiently long period prior to the date of adjudication in order to establish the individual's impairment severity. 20 C.F.R. Pt. 404, Subpt. P, App. 1. This evidence should include treatment notes, hospital discharge summaries, and work evaluation or rehabilitation progress notes if these are available. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Some individuals may actually have worked during the period of time pertinent

to the determination of disability.  Information concerning the individual's behavior during any attempt to work and the circumstances surrounding termination of the work effort are particularly useful in determining the individual's ability or inability to function in a work setting.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Particular problems are often involved in evaluating mental impairments in individuals who have long histories of repeated hospitalizations or prolonged outpatient care with supportive therapy and medication.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Individuals with chronic psychotic disorders commonly have their lives structured in such a way as to minimize stress and reduce their signs and symptoms.  Such individuals may be much more impaired for work than their signs and symptoms would indicate.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The results of a single examination may not adequately describe these individuals' sustained ability to function.  It is, therefore, vital to review all pertinent information relative to the individual's condition, especially at times of increased stress.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  It is mandatory to attempt to obtain adequate descriptive information from all sources which have treated the individual either currently, or in the time period relevant to the decision.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Attention must be given to the effect of medication on the individual's signs, symptoms and ability to function.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  While psychotropic medications may control certain primary manifestations of a mental disorder, e.g., hallucinations, such treatment may or may not affect the functional limitations imposed by the mental disorder.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  In cases where overt symptomatology is attenuated by the psychotropic medications, particular attention must be focused on the functional restrictions which may persist.  These functional

-13-

restrictions are also to be used as the measure of impairment severity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

In some cases, the evidence shows that an individual's impairments are subject to temporary remission.  In assessing whether medical improvement has occurred in persons with this type of impairment, the ALJ will consider the longitudinal history of the impairments, including the occurrence of prior remission, and prospects for future worsening.  Improvement in such impairments that is only temporary will not warrant a finding of medical improvement.  20 C.F.R. § 404.1594 (iv).

The Listing for Affective Disorders is as follows:

**12.04 Affective Disorders**:  Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome.  Mood refers to a prolonged emotion that colors the whole psychic life;  it generally involves either depression or elation. The required level of severity for these disorders is met when the requirements in both A and B are satisfied.
A.      Medically documented persistence, either continuous or intermittent, of one of the following:
1. Depressive syndrome characterized by at least four of the following:
a. Anhedonia or pervasive loss of interest in almost all activities;  or
b. Appetite disturbance with change in weight;  or
c. Sleep disturbance;  or
d. Psychomotor agitation or retardation;  or
e. Decreased energy;  or
f. Feelings of guilt or worthlessness;  or
g. Difficulty concentrating or thinking;  or
h. Thoughts of suicide;  or
i. Hallucinations, delusions or paranoid thinking;  or

2. Manic syndrome characterized by at least three of the following:
a. Hyperactivity;  or
b. Pressure of speech;  or
c. Flight of ideas;  or
d. Inflated self-esteem;  or
e. Decreased need for sleep;  or
f. Easy distractibility;  or

-14-

        g. Involvement in activities that have a high probability of painful consequences which are not recognized;  or

        h. Hallucinations, delusions or paranoid thinking;

or

        3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

AND

B.     Resulting in at least two of the following:

        1. Marked restriction of activities of daily living;  or

        2. Marked difficulties in maintaining social functioning;  or

        3. Deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere); or

        4. Repeated episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors).

20 C.F.R. Pt. 404, Subpt. P, App. 1.

## F.    <u>Other Work</u>

Once the ALJ finds that a claimant cannot return to his or her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy. *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995).  In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant. *Foote*, 67 F.3d at 1558; *Allen v. Sullivan*, 880 F.2d 1200, 1201 (11th Cir. 1989).  This burden may sometimes be met through exclusive reliance on the Medical-Vocational Guidelines [the "grids"]. *Foote,* 67 F.3d at 1558.  Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors.  20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00 (e); *Foote*, 67 F.3d at 1559; *Heckler v. Campbell*, 461 U.S. 458 (1983) (exclusive reliance on the grids is appropriate in

cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements).

Exclusive reliance is not appropriate "either when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills." *Walker v. Bowen*, 826 F.2d 996, 1002-03 (11th Cir. 1987). In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert. *Foote*, 67 F.3d at 1559; *Chester v. Bowen*, 792 F.2d 129, 132 (11th Cir. 1986); *see also MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986) (when non-exertional limitations are alleged, the preferred method of demonstrating that the claimant can perform specific work is through the testimony of a vocational expert). It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy. *See Allen v. Sullivan*, 880 F.2d 1200, 1202 (11th Cir. 1989); *Ferguson v. Schweiker*, 641 F.2d 243, 248 (5th Cir. 1981). In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations. *Foote*, 67 F.3d at 1559.

### 1.    Pain

Pain is a non-exertional impairment. *Foote*, 67 F.3d at 1559; 826 F.2d at 1003. Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged. 42 U.S.C. § 423

(d)(5)(A).  The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.   20 C.F.R. § 404.1528.  In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote,* 67 F.3d at 1560, *quoting Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  Pain alone can be disabling, even when its existence is unsupported by objective evidence, *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself, conclusive of disability.  42 U.S.C. § 423 (d)(5)(A).

### 2.    Credibility

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Foote,* 67 F.3d at 1561-62*; Jones v. Department of Health and Human Services*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence).  A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record. *See Hale v. Bowman,* 831 F.2d 1007, 1012 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986).  As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true.  *Foote,* 67 F.3d at 1561-62*; Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

-17-

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case. *See Smallwood v. Schweiker*, 681 F.2d 1349, 1352 (11th Cir. 1982). If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." *Foote v. Chater*, 67 F.3d at 1562 (quoting *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir.1983) (although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

## V.     APPLICATION AND ANALYSIS

### A.     The Facts

Born on August 20, 1951, Hostetler was fifty-two years old at the time of the ALJ's decision.[2] R. 41. Hostetler has a high-school equivalent education, and his past relevant work experience includes work as a maintenance mechanic and a millwright. R. 68, 112. Hostetler claims an inability to work beginning June 20, 2002. R. 52.

On November 10, 1996, Hostetler underwent a partial hepatectomy of the liver to remove a benign tumor. He was discharged five days later with a diagnosis of abdominal pain due to hemangioma of the liver. His prognosis was good, and by December 1996, his physicians determined that he was doing well. R. 115. On March 31, 1998, Hostetler underwent left primary total knee arthroplasty. He presented with post-traumatic degenerative arthritis of the knees and he had a past medical history significant for multiple joint arthritis. He was released on April 3, 1998 in excellent condition. R. 123-24.

---

[2]He is now almost fifty-four years old.

On September 9, 2001, Hostetler went to Susan Toth, D.O., who noted that he had classic symptoms of depression due to his hepatitis C diagnosis.  She noted that he had tattoos in the past and close contacts with blood and other bodily fluids.  Examination was essentially benign.  R. 200.  On October 3, 2001, Hostetler went to Richard J. Straker, M.D., who noted that Hostetler's biopsies showed Stage II/Grade II hepatitis C.  Dr. Straker opined that Hostetler probably had the disease since his teenage years when he was more promiscuous with drugs and used alcohol heavily.  However, Dr. Straker opined that the disease would progress minimally if Hostetler "behave[d] himself."  R. 132.

On December 3, 2001, Hostetler went to Hugh B. Morris, M.D., for evaluation of his right knee pain.  Examination of the right knee showed 135 degrees of extension and 100 degrees flexion.  Dr. Morris concluded that Hostetler had arthritis, and advised him that he would need knee replacement in the near future.  Hostetler stated that he wanted to maximize conservative treatment, and Dr. Morris agreed, and prescribed Naprosyn and an injection.  R. 171-72.

On January 28, 2002, Hostetler returned to Dr. Morris for further evaluation of his knees.  He stated that he had "a little bit of pain" in his replaced left knee, and chronic pain with his arthritic right knee.  He stated that he had gotten good relief from an injection and with Naprosyn, and did not wish to consider an injection or surgery at the time.  Examination showed fairly good range of motion of the right knee with moderate crepitation from 0 to 120 degrees of flexion (compared to 150 degrees normal).  The left knee had full extension and 105 degrees flexion.  Dr. Morris advised Hostetler to return to him on an as needed basis for further conservative treatment.  R. 169-70.

On February 21, 2002, Hostetler returned to Dr. Toth with complaints of left shoulder pain for the last six months, persistent depression, epigastric pain, and nausea.  R. 199.  On March 16, 2002,

Hostetler underwent an MRI of his left shoulder.  The impression was mild to moderate tentinosis and fraying of the supraspinatus tendon, and mild degenerative changes at the rotator cuff insertion.  R. 181-82.

On May 22, 2002, Michael Jablonski, M.D., performed left shoulder decompression surgery. The postoperative diagnosis was left shoulder rotator cuff tendonitis, subacromial impingement, degenerative arthritis of the acromioclavicular joint, and possible labral injury.  R. 161.  On June 14, 2002, Hostetler returned for a follow-up.  On examination, the incision was well-healed, and he had good range of motion.  The impression was that Hostetler was doing well.  R. 157.  On July 16, 2002, Hostetler returned for a follow-up.  He reported having "absolutely no pain in the shoulder" and was very pleased with the results.  He had full active and passive range of motion.  Hostetler stated that he wanted to return to work full-time.  Dr. Jablonski advised him to proceed slowly.  The impression was doing well.  R. 156.

On July 22, 2002, Hostetler went to Adly Thebaud, M.D., for a psychiatric counseling session. Hostetler stated that his wife recently left him due to his anger.  He admitted going into "mad rages" because he could not deal with people.  He had recently resumed drinking after twelve years of abstinence, and felt depressed, angry, sad, and had violent outbursts.  He had spent fifteen years in prison on charges of manslaughter.  Hostetler admitted to thoughts of suicide.  He stated he had a drink every other day and used marijuana daily.  He stated that his current and present health was fine and did not have any problems. Mental status examination revealed that Hostetler was very depressed and anxious.  He had difficulty with his attention concentration span.  He interacted well with the

doctor, and was engaging and spontaneous.   His Global Assessment of Functioning score was 60.[3]
 The diagnosis was bipolar disorder NOS and anxiety disorder NOS.  Dr. Thebaud prescribed therapy
and medication.  R. 185-93.  Hostetler had another therapy session on August 5, 2002, in which Dr.
Thebaud noted that he continued to be anxious and depressed, and had recently quit his job.  His GAF
was 58.  R. 184.

On August 5, 2002, Hostetler returned to Dr. Toth, who noted that he had been abusing
alcohol.  Hostetler told her that he had been drinking twenty-five beers in eight hours, and would then
drive at illegal speeds.  He had blackouts and nearly had accidents while driving.  He also stated that
his wife had recently left him.  Dr. Toth warned Hostetler that his destructive behavior warranted
immediate attention.  Physical examination revealed no particular problems except questionable ulcer.
R. 197.

On December 19, 2002, Sam Ranganathan, M.D., performed a consultative examination.
Hostetler stated that he was unable to have right knee replacement surgery because of financial
reasons.  He described experiencing knee pain after standing for more than thirty minutes.  His knees
made cracking sounds at times, and he had arthritis of the hands.  Hostetler stated that he used a cane
for stability; however, Dr. Ranganthan observed him walking down a hall without a cane.  Hostetler
stated that he could cook, clean, vacuum, do laundry, and take care of three dogs.  Examination
showed normal grip and well-preserved gross and fine manipulation.  He had good range of motion

---

[3] The Global Assessment of Functioning ["GAF"] Scale describes an individual's overall psychological, social, and occupational functioning as a result of mental illness, without including any impaired functioning due to physical or environmental limitations. DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (American Psychiatric Association 4th Ed. 1994) ["DSM-IV"] at 32.  Axis V of the DSM-IV's multiaxial evaluation assesses a patient's current GAF on evaluation, as well as the patient's highest GAF level in the past year.  DSM-IV at 30 - 33.  A GAF of 51 - 60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks), OR moderate difficulty in social or occupational functioning (e.g., few friends, conflicts with peers or co-workers).  DSM-IV at 32.

of all joints.  Motor strength was 4/5 in the left knee flexion, and normal in all other areas.  He had 140/150 degrees of flexion of the right knee and 100-110 of the left, and full extension of both knees.  Mild degenerative joint disease was seen in the right knee and small joints of the fingers.  The diagnosis was arthroplasty of the left knee, degenerative joint disease of the right knee, and bipolar depression by history, although he was not taking medications.  Dr. Ranganathan opined that Hostetler could stand/walk for two hours, sit for six hours, had no manipulative limitations, had frequent postural and environmental limitations.  R. 211-14.

On January 4, 2003, state agency physician M. delaCerna, M.D., completed a physical residual functional capacity ["RFC"] assessment.   Dr. delaCerna opined that Hostetler could lift/carry 20 pounds occasionally, 10 pounds frequently, stand/walk for 2-4 hours, sit for 6 hours, was unlimited in pushing/pulling ability, could occasionally climb, balance, stoop, kneel, crouch and crawl.  In all other respects, Hostetler had no limitations.  Dr. delaCerna opined that his symptoms were consistent and credible.   He also disputed Dr. Ranganathan's restrictions that limited Hostetler to standing/walking for only two hours.  R. 259-66.

On January 30, 2003, state agency physician Jeffrey L. Prickett, Psy.D., completed a mental RFC assessment.  Hostetler was moderately limited in the ability to carry out detailed instructions, the ability to maintain attention and concentration for extended periods, and the ability to complete a normal work week without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods. R. 215 - 16.  He was also mildly restricted in his activities of daily living and in maintaining social functioning, and moderately limited in his ability to maintain concentration, persistence or pace. R. 229 ("B" Criteria).  The final

diagnoses were affective disorder, anxiety-related disorder, and substance addition disorder. R. 215-29. Dr. Prickett concluded that Hostetler had the following functional capacity:

> Claimant is able to complete simple instructions, make simple decisions, and do routine tasks that are within his physical limits. He can concentrate on simple tasks. Social and adaptive functioning appear adequate. Functioning would improve with abstinence from drug and alcohol abuse.

R. 217.

On April 14, 2003, state agency physician Alejandro F. Vergara, M.D., completed a mental RFC assessment. Hostetler was moderately limited in his ability to carry out detailed instructions; in his ability to maintain attention and concentration for extended periods; in his ability to set realistic goals or make plans independently of others; and in his ability to complete a normal workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods. R. 233 - 34. He was also mildly restricted in his activities of daily living, mildly restrict in maintaining social functioning, and moderately limited in his ability to maintain concentration, persistence or pace. R. 247 ("B" Criteria). Hostetler denied a history of psychiatric disease prior to his appointment with Dr. Thebaud in July 2002. R. 233-50. Dr. Vergara concluded that Hostetler had the following functional capacity:

> Claimant is able to understand, remember, and carry out simple instructions. He can make simple decisions and do routine tasks that are within his physical limits. He can concentrate on simple tasks. His social and adaptive functioning appear to be adequate.

R. 235.

Hostetler returned to Dr. Thebaud on April 15, 2003 for anxiety and depression. He had not taken his medication for six to eight months. His GAF was 56.[4] R. 267-68.

On May 1, 2003, state agency physician Nicholas H. Bancks, M.D., completed a physical RFC assessment. Dr. Bancks determined that Hostetler could lift/carry 20 pounds occasionally, 10 pounds frequently, sit/stand/walk for 6 hours, was unlimited in pushing/pulling ability, could occasionally climb ramps and stairs (but never ladders, ropes or scaffolds), balance, stoop, kneel, crouch and crawl. Hostetler was to avoid concentrated exposure to hazards. In all other respects, Hostetler had no limitations. Dr. Bancks opined that Hostetler's symptoms were partially credible, and he disputed Dr. Ranganathan's findings. R. 251-58.

### B.   The Analysis

#### 1.   The ALJ Accorded Proper Weight to Hostetler's Physicians

Hostetler argues that the ALJ failed to give substantial weight to the opinions of Dr. Ranganathan, a one-time consultative examining source, and instead, accorded greater weight to the opinions of state agency physicians. More specifically, Hostetler contends that the ALJ improperly evaluated the severity of his knee impairments and should have adopted Dr. Ranganathan's opinion that Hostetler could stand and walk for just two hours per day. The Court disagrees. Substantial evidence does not support Dr. Ranganathan's opinions, and the ALJ set forth appropriate reasons for the weight given. R. 18.

The relevant evidence shows that Hostetler had degenerative osteoarthritis in both knees. He underwent left knee replacement in 1998. Thereafter, there is almost no evidence reflecting pain or

---

[4] See n.3 above.

treatment for the left knee.  Regarding his right knee, the record contains treatment notes or evaluations from four physicians: Dr. Morris (treating source), Dr. Ranganathan (one-time consultative examining source), Dr. delaCerna (state agency physician), and Dr. Bancks (state agency physician).  Hostetler went to Dr. Morris on about two occasions.  In December 2001, Dr. Morris found good range of motion of both knees.  Dr. Morris advised Hostetler that he would need surgery at some point, but Hostetler declined, citing financial reasons.  Treatment comprised medication and an injection.

In January 2002, Hostetler stated that he had obtained good relief from the medication and injection, and did not need any further injections.  Dr. Morris found fairly good range of motion of the right knee, and nearly full range of motion of the left.  Thereafter, there are no records reflecting visits to any treating physicians for knee symptoms.  Indeed, although Hostetler went to Dr. Morris' colleague, Dr. Jablonski, multiple times from February through July 2002 for treatment of his shoulder impairment, he never complained of knee symptoms during those visits.  In May 2002, Hostetler even told Dr. Jablonski that he was ready to resume full-time work.

In December 2002, Dr. Ranganathan performed a consultative examination.  He determined that Hostetler had good-to-full strength and ranges of motion of both knees.  Despite such a benign finding, Dr. Ranganathan limited Hostetler to standing/walking for only two hours per day.  Understandibly, both state agency physicians questioned this limitation.  In January 2003, Dr. delaCerna stated "[Dr. Ranganathan] is severely restricting standing & walking to only 2 hrs. [Claimant] has a normal gait."  R. 265.  He concluded that Hostetler could perform light work and stand/walk for 2 - 4 hours.  Similarly, in May 2003, Dr. Banks noted that Dr. Ranganathan's

limitations were "[i]nconsistent [with] own observation [of normal] gait," and he determined that Hostetler could perform light work and stand/walk for six hours.  R. 257.  In sum, the ALJ properly gave greater weight to the state agency physicians' opinions, as Dr. Ranganathan's opinion was not consistent with the evidence.[5]

### 2.    The ALJ's Hypothetical Questions Omit Some Non-Exertional Limitations

Hostetler argues that the ALJ erred by failing to accurately incorporate his mental limitations into her hypothetical questions to the VE.[6]   Hostetler is correct.  In her decision, the ALJ does consider and discuss Hostetler's mental limitations at length.  R. 18 - 19, 20, 21, Findings 3, 6, 11 - 12.  First, the ALJ reviews Dr. Susan Toth's finding of persistent depression with an anxiety component, as well as the records of Dr. Adly Thebaud, a psychiatrist, who diagnosed bipolar and anxiety disorders.  R. 16.  The ALJ correctly found that Hostetler's affective and anxiety disorders were "severe" under the regulations, but without marked limitations of function that would make them severe enough to meet the Listing.  R. 17.

Next, the ALJ found Hostetler's subjective complaints of depression and anxiety "not totally credible" because they fell beyond what would be reasonably expected.  R. 18, 21, Finding 5.  The ALJ noted Hostetler's non-compliance with his medications to control depression and anxiety, and

---

[5]Hostetler also argues that the ALJ failed to properly evaluate his subjective complaints of pain in his knees.  As demonstrated, the evidence shows no underlying medical condition of such a severity that can be reasonably expected to give rise to the alleged pain.  Hostetler contends that the ALJ erroneously discredited his allegations.  In a "torrential" or "shotgun pleading" approach, Hostetler recites a catalog of specific errors that the ALJ allegedly committed in discrediting him.  Pltf.'s Brief at 11-14.  Having considered these allegations, the Court concludes that the ALJ properly discredited Hostetler's testimony.

[6]Hostetler further contends that the ALJ erroneously based her hypothetical on the findings of the state agency physicians instead of Dr. Ranganathan.  As summarized above, substantial evidence did not support the findings of Dr. Ranganathan.

discounted his explanation about inadequate funds because he used funds to instead purchase alcohol and marijuana.  R. 18.

The ALJ expressly concurred with two state agency doctors, Jeffrey L. Prickett, Psy.D. and Alejandro F. Vergara, M.D., that Hostetler was capable of simple repetitive tasks despite his mental impressions, and was 1.) mildly restricted in his activities of daily living; 2.)  mildly restricted in maintaining social functioning; and 3.) moderately limited in his ability to maintain concentration, persistence or pace  —  the "B" Criteria.  *See* R. 19, 229, 247.  In concurring with the shorthand finding that Hostetler was "moderately limited in his ability to maintain concentration, persistence or pace" under the "B" Criteria  (PRTF, Rating of Functional Limitations), R. 229, 247, the ALJ was presumably also concurring with the long-form opinion shared by Drs. Prickett and Vergara that Hostetler was 1.) moderately limited in his "ability to carry out detailed instructions;" 2.) moderately limited in his "ability to maintain attention and concentration for extended periods;" and 3.) moderately limited in his "ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods."  R. 215 - 16, 233 - 34 (Mental RFC Assessments).  The ALJ did not state whether she concurred with Dr. Vergara's opinion that Hostetler was also "moderately limited in his ability to set realistic goals or to make plans independently of others."  R. 234.

The ALJ concluded that Hostetler's ability to perform substantially all of the requirements of light work was impeded by *exertional* limitations.  *See* R. 21, Finding 12.  The ALJ also concluded that Hostetler's non-exertional limitations restricted him to work in which he is able to understand,

remember, and carry out simple instructions, and to make decisions and do routine tasks, and to concentrate on simple tasks.  R. 21, Finding 6.

Once the ALJ found that Hostetler could not return to his prior work, the burden of proof shifted to the Commissioner to establish that Hostetler could perform other work that exists in the national economy.  In determining whether the Commissioner met that burden, the ALJ was required to develop a full record regarding the vocational opportunities available to Hostetler.  Because of Hostetler's non-exertional limitations, the ALJ properly called a VE.  In her second hypothetical question to the VE, the ALJ asked about certain non-exertional functional capacities retained by Hostetler:

> Q.    And if I add to that [first] hypothetical that he can understand, remember, and carry out simple instructions and make simple decisions and do routine tasks, as well as concentrate on simple tasks, would that change your response [that Hostetler could perform other work in the national economy]?
> A.    No.

R. 315.

This Court presumes that the ALJ intended to ask  —  and that the VE understood from the context that the ALJ was indeed asking — the VE to hypothesize an individual who "can understand, remember, and carry out *only* simple instructions; and make *only* simple decisions; and do *only* routine tasks; as well as concentrate *only* on simple tasks."  Otherwise, the second hypothetical question adds no limitations to the first hypothetical question.  In any event, the ALJ's question does not ask the VE to assume all of the non-exertional limitations that the ALJ found Hostetler to have.

Hostetler's attorney then asked the VE a hypothetical question that added the mental limitations determined by the state agency doctors:[7]

> Q.       But from the mental standpoint if he was "moderately limited" — and I'll define that for you in a moment   —   in the ability to maintain attention and concentration, follow detailed instructions, the ability to complete work — a normal work week or work day without interruptions from psychologically-based symptoms, and to perform at a consistent pace without unreasonable rest periods.  "Moderately" is defined in the Global Assessment of Functioning scale as a flat affect, circumstantial speech, occasional panic attacks, or a moderate difficulty in social, occupational, or school functioning, such as few friends, conflicts with peers or co-workers.  Would that change your answer for those jobs that you mentioned?
> A.       Well, it would have an effect on the jobs. I think it would have a negative effect.  It would be hard to state for sure he couldn't perform it, but it would make it difficult.
> Q.       Do you think that he would be able to perform it on a competitive basis in the work world that we have today based on your experience as a vocational evaluator?
> A.       Well, it'd probably be difficult to hold a job with those moderate limitations.  They would build up over a period of time and produce a negative effect on job stability.

R. 3, 318-19.[8]  Indeed, the VE opined would be difficult for Hostetler to perform and maintain the very jobs that the ALJ proposed if Hostetler had the moderate limitations in which the ALJ concurred. The testimony of the VE did nothing to support, and in fact detracted from, the ALJ's conclusion that the Commissioner had met her burden of proving that Hostetler could adjust to light semi-skilled work

---

[7]The attorney obtained those limitations from the two DDS Mental RFC and Psychiatric Review Technique Forms described in the fact section above.  *See* Exhibit 12F (DDS's MRFC and  PRTF dated 1/30/03 at R. 215 - 32); Exhibit 13F (DDS's MRFC and PRTF dated 4/14/03 at R. 233 - 50); R. 319.

[8]The Global Assessment of Functioning ["GAF"] Scale in the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, describes an individual's overall psychological, social, and occupational functioning as a result of mental illness, without including any impaired functioning due to physical or environmental limitations.  *See* DSM-IV at 32.  A GAF code of 51 - 60 indicates "moderate symptoms" (e.g., flat affect and circumstantial speech, occasional panic attacks) OR  "moderate difficulty in social or occupational functioning" (e.g., few friends, conflicts with peers or co-workers).  DSM-IV at 32.

as an assembly worker and light unskilled work as a security guard,[9] and that there were a significant number of those jobs in Florida that Hostetler could perform.

The Court has considered the Commissioner's argument that Hostetler's complaints of anxiety and depression were sporadic from about July 2001 through February 2002, and that they may have been rationally related to his diagnosis of hepatitis C. The Court has considered that Hostetler sought treatment from a mental health professional on just three occasions, in July and August, 2002, and April 2003, and that he admitted, in August 2002, to abusing alcohol (drinking twenty-five beers in eight hours). The Court has considered that Hostetler was prescribed medication, but conceded that he was not taking it regularly for at least six to eight months, if at all. The Court has also considered that, in determining Hostetler's limitations, the ALJ properly discounted Hostetler's credibility on specified grounds. Lastly, the Court has considered the common sense argument that a claimant should not benefit from non-exertional limitations that result from his non-compliance with psychiatric medications or from substance abuse. Nevertheless, without relying on the regulations pertaining to alcohol and drugs, the ALJ found that Hostetler actually had certain non-exertional limitations, yet assessed his ability to do other work without reference to those limitations. On the present record, the Commissioner has not met her burden and remand is appropriate.

### 3.    The ALJ Properly Developed the Record Regarding Hostetler's Mental Impairments

Finally, Hostetler argues that the ALJ failed to fully develop the record concerning his mental impairments by failing to order a consultative evaluation. This argument is meritless. To conduct a

---

[9]Hostetler told Dr. Thebault that he had spent fifteen years in prison on charges of manslaughter. If true, he might not be a good choice for employment as a security guard, particularly if he cannot concentrate on monitors.

full and fair inquiry, the ALJ need not order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision. As summarized above, the record contained sufficient evidence regarding Hostetler's mental impairments for the ALJ to render her decision — and to find mild and moderate limitations as she did. Hostetler was represented by an attorney at the administrative hearing. He did not furnish additional medical evidence even though he conceded that there is "an almost incomplete [sic] lack of medical records pertaining to [his] psychological impairments." R. 15. At the hearing, the ALJ did specifically inquire into Hostetler's mental impairments. The ALJ fully and fairly developed the record. Of course, the Commissioner is free to further develop the record on remand.

## VI.    <u>CONCLUSION</u>

For the reasons stated above, the decision of the Commissioner should be **REMANDED** under Sentence Four for further proceedings not inconsistent with this decision. The Clerk should enter a judgment.

**DONE and ORDERED** this 27th day of July, 2005.

JAMES G. GLAZEBROOK
UNITED STATES MAGISTRATE JUDGE

The Court Requests that the Clerk
Mail or Deliver Copies of this Order to
All Counsel of Record and *Pro Se* Litigants,
and to:

-31-

Mary Ann Sloan, Chief Counsel
Dennis R.  Williams, Deputy Chief Counsel
Paul Jones, Assistant Regional Counsel
Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia        30303-8920

Susan Roark Waldron
Assistant United States Attorney
400 N. Tampa St., Suite 3200
Tampa, FL               33602

The Honorable Philemina M. Jones
Administrative Law Judge
c/o Social Security Administration
Office of Hearings and Appeals
Suite 300, Glenridge Building
3505 Lake Lynda Drive
Orlando, FL             32817